(Decided March 31st, 1897).

---

## WILLIAM  H.  SCHUTZ *vs.* WILLIAM  J.  FERGU-SON.

*Contracts—Sufficiency of Evidence—Alteration in Building Contract.*

Plaintiff entered into a contract to erect a certain building, and the
due performance of the contract was guaranteed by a fidelity com-
pany.  He became financially embarrassed and assigned the con-
tract to the company, which afterwards employed the defendant to
complete the building.  Defendant subsequently agreed with the
owner to do the work in a manner substantially different from that
provided for by the original contract.  Plaintiff filed a bill for an
account alleging that he had assigned his contract to the company
at defendant's request, and in consideration of defendant's promise
to finish the building and pay to the plaintiff all profits made by him
over and above two and one-half per cent. of the cost.  *Held,* that
the evidence failed to sustain the allegations of the bill respecting
the promise of the defendant or that the assignment of his contract
was made by the plaintiff upon the faith of such promise.

A clause in a building contract providing that the architect may require
any alterations in the work described in the specifications does not
authorize the architect to demand that an additional number of
stories be added to the building.

Appeal from a decree of the Circuit Court of Baltimore
City (DENNIS, J.), dismissing the bill of complaint.

The cause was argued before McSHERRY, C. J., BRYAN,. FOWLER, BRISCOE, PAGE, BOYD and RUSSUM, JJ.

*Fielder C. Slingluff* and *Thomas S. Baer,* for the appellant.

*William A. Fisher* and *Roger W. Cull,* for the appellee.

BOYD, J., delivered the opinion of the Court.

The appellant, who was plaintiff below, entered into a contract with Dr. William H. Moale, on July 13th, 1892, to construct a building in Baltimore City known as " Hotel Stafford." The Fidelity and Deposit Company of Maryland became his surety for the proper fulfilment of the contract, and he commenced work on the day after it was signed. On Friday, the second day of September, 1892, he left Baltimore without leaving any directions or money for the work, and according to his testimony went as far as Chicago. When he reached that city he determined to return and arrived at Baltimore the following Tuesday morning, being the sixth day of September. He accounts for his absence by saying that the heat had affected his head, and his physician had advised him to go away. The theory of the appellee is that he left by reason of financial embarrassment and inability to perform this and another contract he had on hand. Whatever the cause was, his sudden disappearance and speedy reappearance was, to say the least, very peculiar. When it was ascertained he had gone, the Fidelity Company was informed of the fact and that the work was at a standstill. The contract provided that the work should be finished on or before the first day of October, 1893, and that the contractor should pay the owner $50 for every day thereafter that the work should remain unfinished, as liquidated damages. Mr. Warfield, the vice-president and general manager of the company, became anxious and sent for the appellee, who was then superintending the construction of a building being erected by the Fidelity Company. Upon inquiry he ascertained that Schutz was still away, but a day

or two afterwards he returned and Ferguson saw him at the instance of Mr. Warfield, who also had several interviews with him. On the 7th day of September Schutz assigned his interest in the contract to the Fidelity Company, and he alleges in his bill that he did so because Ferguson proposed to him that if he would, he, Ferguson, would finish the building in· accordance with the terms of the contract, and pay him all he made under it over and above two and one-half per cent. The bill then charges that the defendant did finish the Hotel Stafford, and made a large amount of money in the construction of it but refused to render an account to the plaintiff. It then prayed that an account may be taken· and the profits over and above two and one-half per cent. be required to be paid to the plaintiff.

The answer admits that the assignment to the Fidelity Company was made, but allegès that the defendant was at that time only acting for that company, that he " had no desire, intention, purpose, or agreement to take employment from said company to finish the building in accordance with the terms of the said contract," and then emphatically denies any agreement to pay the plaintiff all profits over two and one-half per cent. It admits that the defendant did build the Hotel Stafford, as it now stands, but alleges that it was done under other contracts than the one between the plaintiff and Dr. Moale.

The important issue raised by the bill and answer is, whether the defendant did promise to pay the plaintiff the profits made over and above the two and one-half per cent. Whether or not there were any profits need not now be determined, and is not material to the inquiry now before us, excepting incidentally in considering the probabilities as to whether the contract was made by the defendant with the plaintiff, as claimed by the latter. The plaintiff testified that the Tuesday morning he got back he saw Mr. Warfield, who said to him, "Go home ; we see you are sick ; go home and go to bed and get your doctor to attend to you and we will attend to this until you get well," and that

" Mr. Ferguson would attend to it for them.   I went home
and in about an hour or so after that Mr. Ferguson came to
my house.   I was in my room and Mr. Ferguson came up
and said, ' I will take the job off your hands now and do it
for you for two and one-half per cent., which is the same
as I am doing the Fidelity Company building for them ; 2½
per cent.,' and he said, ' If there is anything left when the
job is done, you shall get it.   The Fidelity Company don't
want to make anything out of it ; if they get out clear they
are satisfied.' "   The next day the bookkeeper of the de-
fendant took the assignment to the plaintiff, which he signed.
The wife of the appellant testified she was present and in
answer to the question whether Ferguson made any proposi-
tion to her husband, said, " Yes, sir ; he said that he would
do the work for my husband for ——; he said he would do
the work for my husband the same as he was doing at the
Fidelity building ; he was doing that work and all over 2½
per cent. my husband was to get out of the contract after
it was done ; on Dr. Moale's house."   Harry W. Schutz,
a son of the appellant, said he was present at the interview,
and in answer to the question as to what occurred, said,
" When I came home one morning Mr. Ferguson and my
father and mother were in the room, and the conversation
that they were talking about at the time was the Stafford
Hotel, and Mr. Ferguson and my father were speaking
about my father turning the building  *  *  *  *  of the
Stafford over to Mr. Ferguson, in consideration of which he
was to get all over 2½ % on the job."   The purport of
the agreement as given by the wife and son was that the
appellee was to take the contract—not that the Fidelity
Company was.   The son said in answer to the question,
" Was anything said then about the assignment of the con-
tract to the Fidelity Company ?"   " Not that I heard, sir ;
I didn't hear that," although he did say that he was not
present during all of the interview.   The only other witness
offered by the plaintiff on this point was Benjamin Watts,
who was foreman for Schutz.   He said he went into Schutz's

shop on the sixth of September, where Schutz and Ferguson were. The former said to the latter, " I would like Mr. Watts to remain on this job, and Mr. *Schutz* (should be Mr. *Ferguson*, we suppose), said he would be glad—he would like me to remain there also, being as I had been on the job. Mr. Schutz then says that Mr. Ferguson was to take the job at 2½ per cent." Mr. Watts did continue on the job under Ferguson.

The evidence of Schutz shows that he knew on the 6th and 7th of September, 1892, that Ferguson was acting as agent for the Fidelity Company, in the negotiations between them on those dates. He assigned the contract with Dr. Moale to that company and not to Ferguson. It is difficult to believe that Ferguson would have undertaken to bind himself to turn over to Schutz any part of the profits over and above his own compensation of 2½ per cent. when they would belong to the Fidelity Company, and not to himself. Nor can we understand how Schutz would suppose that he would have done so. It was the Fidelity Company that was interested in getting control of the contract, as it was liable for the defaults of Schutz, to the extent of $50,000. It is conclusively shown that it was impossible to complete the contract within the time Schutz had agreed to complete it, and the appellee swore most emphatically that he would not have taken the contract at the sum agreed upon by Schutz. In point of fact, he had not even agreed to superintend the work for the Fidelity Company when the plaintiff claims he made the agreement with him. The agreement with that company is in writing and speaks for itself. It was executed on the 23rd day of September—more than two weeks after the alleged arrangement with the plaintiff. It shows that Ferguson had agreed with the Fidelity Company to assume and complete the Schutz contract for the sum of $166,466, which was nearly five thousand dollars more than Schutz's contract called for, and he also agreed to be satisfied with two and one-half per cent. commissions on the net cost of the work and to

rebate the balance, provided the building did not cost more than the above-mentioned sum. After that was executed, Ferguson was, as between him and the company, the contractor for the building, and not merely the agent of the company, but it was not until then that such was the case, and on the 6th day of September he had no agreement with the Fidelity Company to take charge of the work. The allegation in the bill that the defendant proposed to the plaintiff that if he would assign the contract, he, the defendant, would be employed by the company to finish the building, is not sustained by the proof. The evidence of Mr. Warfield as well as that of the defendant, shows that no arrangement had been made at that time with the defendant. Mr. Warfield testified that after waiting some days after the contract was assigned, to see whether Schutz would again take up the work, he requested Ferguson to carry out the contract for the company, but he declined to do so. He then asked him to see some of the other persons who had bid on the building, and he tried to get them to take it, but they declined. After they found that they could not get anyone else, he insisted upon Ferguson, who was under some obligations to the company, taking hold of the contract and he finally consented and the agreement above mentioned was then made. Mr. Warfield and the defendant are uncontradicted as to these efforts to have some one else take charge of the work.

But there is another circumstance that seems utterly at war with the theory and claim of the plaintiff. Mr. Warfield said that Schutz had a number of interviews with him and others connected with the company after the assignment of the contract, looking to making some arrangement to carry it out, and this was not denied by him. Now, if it be true that he and Ferguson had entered into an arrangement on September 6th, by which he was to assign the contract, and Ferguson was to give him all the profits over two and one-half per cent., upon what theory could he rightfully ask of the company the privilege of complet-

ing the contract? If the defendant was bound to account to him, why was not he bound by the assignment of the contract? What was to become of Ferguson and his profits if the company reassigned the contract to Schutz or let him proceed with it to the exclusion of Ferguson? Such conduct is wholly inconsistent with the claim that Ferguson had on the day previous to the assignment entered into such an agreement with him as is relied on as the foundation for the bill of complaint. After the agreement of September 23rd, 1892, was entered into between the company and Ferguson, he continued to superintend the work, and the company was still liable to Dr. Moale, as surety of Schutz. Sometime afterwards (the exact time is not clearly shown), a contract was entered into between Dr. Moale and Ferguson, which was a copy of the Schutz contract. There was endorsed on it, however, a provision that the building was to be finished on the first of· July, 1894, instead of the first of October, 1893, as was in the original agreement, and that in the event of it not being finished, then five dollars per day should be paid as liquidated damages, whilst in the original it was $50 per day. A number of other changes were made from time to time, which were to cost over $50,000, including the addition of two stories to the building. After these material changes were made the parties then seemed to treat Ferguson as the responsible party, and he was not deemed by them to be merely the agent of the· Fidelity Company, but this was months after the appellant had assigned his contract. Whilst we think the changes could not relieve the appellee from his agreement with the appellant, if there was any, yet it is apparent that the latter could only have had an interest in the contract as it existed when he transferred it. Although it is true that the contract did have a provision under which the architect could "require any alterations in the work shown or described in the drawings or specifications," he could certainly not, under that clause, require the contractor to add additional stories to the building, un-

less he chose to agree to do so.   Such a construction of a contract might ruin a contractor of limited means, who might be prepared for the work as originally contracted for, and all reasonable alterations in it, but not for the addition of two or more stories to the building.

But the difficulty in the plaintiff's case at the very threshold is, that the evidence shows clearly that the appellee did not have any contract with Dr. Moale until long after the appellant had disposed of his, and he had no contract with the Fidelity Company, and so far as the record shows, none was contemplated, when the appellant assigned the contract.   But that is not all, for it is conclusively shown that when the appellee did make a contract with the company, he was only to receive therefrom two and one-half per cent. commissions on the net cost of the work.   The appellee denied having made the agreement with the appellant, and he is not only sustained by Mr. Warfield as far as he was cognizant of the transaction, but the uncontradicted evidence as to the time and extent of the appellee's connection with the work, and the subsequent conduct of the appellant, make it impossible to accept the testimony of the appellant, his wife and son, as establishing such an improbable agreement as they claim was made.   Mr. Watts said Schutz said Ferguson was to take the job at two and one-half per cent., but added, he did not hear Ferguson say so, although we suppose from the connection it was said in his presence.   The fact is that Ferguson did eventually superintend the work at two and one-half per cent., and Mr. Watts did not say that Schutz said anything about Ferguson agreeing to give him any part of the profits.   Just what Schutz, his wife and son had in mind it is difficult to tell, but the appellee says that he explained to Schutz that he was then superintending the work of the Fidelity Company building for two and one-half per cent., and he did not suppose any one would do such work for less.   He said : '' I told him then that in case the job cost more than the contract the Fidelity Company had to sue him for the

difference, obtain judgment, and would hold the judgment over him as long as he lived, and that would bar him from taking future contracts; and in case the job cost less he would be paid the difference between the contract price and the cost of the job.    By doing this I tried to persuade him to take the job up again and go to work on it." It may be that this expression, or something else that was said in that conversation, left the appellant, his wife and son, under the impression that if he gave up the job he would get all over two and one-half per cent. of the profits, but if that be conceded, it would be the Fidelity Company and not the appellee who would owe it, if any one.   For, as we have already seen, Ferguson was simply representing that company, and had no interest in it himself at the time, and did not want to take the work at all.

We have not dwelt on the fact that most of the witnesses examined on the subject seemed to think it was impossible to finish the building within the time agreed on in the Schutz contract, nor have we thought it necessary to discuss his financial condition when he gave up the work, although it is evident he did not have the means necessary to complete the contract in accordance with its terms, but when we read the evidence on those subjects and remember that the appellant had on hand another contract, for the fulfillment of which the Fidelity Company was his surety, and see how his health was impaired, it is easy to understand why he was apparently so willing to give up both contracts.    But without prolonging this opinion by going more into detail than we have, we think the appellant has failed to establish the fact that the appellee did agree to turn over to him the profits, if any, beyond the two and one-half per cent. in consideration of his assigning the contract to the Fidelity Company.    There is certainly a total failure of proof to show that the alleged promise to pay over the profits was in consideration of the assignment of the contract, and that being so there was no consideration to sustain such a promise, as no other was attempted to

be shown.   The decree dismissing the bill must be af-
firmed.

*Decree affirmed with costs.*

(Decided March 31st, 1897).